## LOVINGER v. GARVAN, Alien Property Custodian, et al.

(District Court, S. D. New York. October 25, 1920.)

1. Insurance ☞587—Requisites to change of beneficiary in life policy stated.

Where there has been no valid contract made by the insured in a life policy during his lifetime nothing short of an actual exercise of the power given to change the beneficiary according to its conditions will effect such change.

2. Insurance ☞587—Contract to change beneficiary in life policy enforceable.

A promise by the insured in a life policy, payable to a beneficiary named, for a consideration, to change the beneficiary under a power reserved in the contract, is enforceable by the promisee after the death of the insured, and equity will disregard the formal steps and treat the promisee as an already substituted beneficiary.

3. Insurance ☞587—Contract to change beneficiary in life policy valid.

A promise by a woman who had sustained an injury necessitating a surgical operation, to substitute complainant as beneficiary in a life

policy under a power reserved, if complainant would keep and care for her during and after the operation, which complainant did, although not moved thereto wholly by the promise, but partly by motives of kindness and charity, *held* to constitute a contract which equity would enforce after the death of insured without having effectively executed the power.

**4. War ⬤═12—Notice by publication required in proceeding under Trading with the Enemy Act.**

Where proceeds of a life insurance policy payable to insured's brother, a citizen of Hungary, had been paid to the Alien Property Custodian, in suit against the Custodian under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), by one who claimed such proceeds on the ground insured had changed the beneficiary in the policy by substituting plaintiff for insured's brother, the brother was entitled to notice; but, his whereabouts being unknown, except that he was last supposed to be in Hungary, the court would order notice printed four times at weekly intervals in some paper in Buda-Pest and the next largest city in the then existing republic, advising him that he must file his appearance within 6 weeks of the last publication, this being the best possible substitute for actual notice.

In Equity. Suit by Paula Lovinger against Francis P. Garvan, Alien Property Custodian, and others. Decree for complainant.

This is a bill in equity under section 9 of the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e) by a citizen who claims a fund paid to the Alien Property Custodian. Roza Molnar, a citizen of Hungary resident in the United States on November 29, 1917, secured a policy of life insurance in the sum of $1,000 from the New York Life Insurance Company, payable in the event of her death to one Sandor Kamarony, her brother, likewise a citizen of that kingdom and therefore an alien. At that time Roza Molnar had been living for some three years or more with the plaintiff, an American citizen. So far as appears, she had no relatives or friends in the United States and she was in bad health. She was, however, sporadically able to earn about $30 a month in household service, but was obliged for the larger part of the time to be idle. During these periods she lived with the plaintiff, and neither paid for her entertainment nor contributed in the household work. The plaintiff was a married woman with three children, living with her husband in New York. She was friendly disposed to Roza Molnar, and allowed her to live in her family, at least in part, from motives of charity.

About May, 1918, Roza Molnar met with an accident, which required some sort of surgical operation, and at her earnest request the plaintiff allowed the operation to take place at her home, rather than at a hospital. She made a bad recovery, and continued sick until November 8, 1918, when, developing pneumonia, upon her doctor's orders she was taken to a hospital, where she died on November 12, 1918. During this period of six months the plaintiff nursed her at her house.

The life insurance policy had the customary provision by which the insured could change the beneficiary at her pleasure by written notice given to the home office of the insurer, followed by an indorsement of the change upon the policy itself. This was never done, though Roza Molnar requested the collecting agent of the company to substitute the plaintiff, at one time during her sickness and after the accident. He put her off by suggesting that she might safely wait until she had recovered. On the day before her death, Roza Molnar, while in the hospital, had a notary public called in, and in the presence of the plaintiff and her husband executed a document, drawn by the notary and witnessed by the notary and the husband, by which she bequeathed the policy and her money in bank ($25) to the plaintiff. This document is not asserted by the plaintiff to have effected a transfer of the

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

insurance, but the policy was actually there, and Roza Molnar handed it to the plaintiff at the time..

The plaintiff and her brother testified that Roza Molnar, during her sickness at numerous times not specified, had said that she meant on her death to leave the plaintiff her insurance and all she had, because of the plaintiff's great kindness in nursing and taking care of her. The brother's version of a talk after the accident and before the operation was as follows: "Let me stay here with you and take care of me, and I will try (sic) whatever I have to leave to you." Again: "I will leave my New York Life insurance policy for $1,000 to you for keeping me and nursing me." The plaintiff is said to have answered: "Dont worry; I will take care of you and nurse you just as good (sic) as if you would be (sic) my sister."

The Alien Property Custodian seized the interest of the beneficiary, Sandor Kamarony, under the Trading with the Enemy Act, and has therefore succeeded to his rights. The question arises as between the defendants so substituted and the plaintiff.

Morris Cukor, of New York City, for plaintiff.
Earl B. Barnes, of New York City, for defendants.

LEARNED HAND, District Judge (after stating the facts as above). [1] The beneficiary of a policy such as this has a contingent interest, which becomes absolute upon the death of the insured, living himself. That interest is, however, subject to defeat by the reserved power of the insured to change the beneficiary and appoint another. Therefore in these cases the question is whether the power has been exercised, or, if not, whether the new beneficiary has the right to compel its exercise after the death of the insured. Where there is no valid contract made by the insured during his life, the rule has uniformly been, so far as I have found, that nothing short of an actual exercise of the power according to its conditions will effect a change. Thomas v. Thomas, 131 N. Y. 205, 30 N. E. 61, 27 Am. St. Rep. 582; Fink v. Fink, 171 N. Y. 616, 64 N. E. 506; Stafford v. Brotherhood, 224 N. Y. 653, 121 N. E. 892; Freund v. Freund, 218 Ill. 189, 75 N. E. 925, 109 Am. St. Rep. 283; Berg v. Damkoehler, 112 Wis. 587, 88 N. W. 606; Sullivan v. Maroney, 77 N. J. Eq. 565, 78 Atl. 150. This, as was observed in Thomas v. Thomas, supra, follows from the doctrine that equity will not intervene in favor of a donee to execute a power. The gift is incomplete until the power has been exercised, which means that its terms must be fulfilled. That is the analogue to the delivery of a gift.

[2] However, if the new beneficiary is a promisee for consideration of the person having the power, he has a right to compel the specific performance of the power, which is not determined by the death of the promisor. If the whole transaction were carried out in detail, he could compel the executors of the promisor to execute the power, which would speak as of the date of the contract. Equity will disregard the formal steps, and treat the promisee as an already substituted beneficiary. Nally v. Nally, 74 Ga. 669, 58 Am. Rep. 458; Schoenholz v. N. Y. Life Ins. Co. (App. Div. 1st Dept.) 183 N. Y. Supp. 251. This does not, however, depend upon any vague theory of equity, nor is it based upon general motives of supposed justice. It rests upon the existence of an enforceable contract between the insured and the promisee, creating an obligation to use his reserved power. The case

at bar, therefore, turns absolutely upon the existence of such an obligation.

[3] The plaintiff never gave any promise to Roza Molnar, but none was necessary, because the contract, if any was made, was unilateral. The critical question is whether the parties mutually understood that the promise was made as a consideration for the performance. That is not always an easy question to decide; it depends upon whether the promise was intended to induce the promisee to perform, and whether she was in fact induced by it to do so. That is in turn a question of the actuating motives of the parties. In a case like this, where the performance is explicable in part, at least, from motives of kindness or charity, the question is whether, notwithstanding such motives, the performance was not in part actuated by the promise as well, and understood to be so actuated.

The plaintiff's story is not so probative of her case as her brother's, some of whose language is hardly consistent with any other conclusion than that of a contract. Still I cannot rely upon the exact words which either puts into Roza Molnar's mouth. It is certain that she intended to give the policy to the plaintiff, told her that she would do so, and tried to effect that result. Most of the services rendered by the plaintiff followed the promises, and could have been a consideration for them. I do not rely upon the will, except as corroboration of what had gone before.

Now, it appears to me to fail in understanding the posture of these two women to each other, to read what they said as being nothing but an expression of gratitude and kindness. That it included these is true enough, but I think it went further. The plaintiff was in narrow circumstances, and the presence of Roza Molnar in her home, sick and penniless, both must have known to be a serious incumbrance to her. It seems to me not in any sense to impugn the kindliness of the plaintiff to suppose that Roza Molnar made the promise to insure her continued services, and that the plaintiff accepted the promise in the same sense. I find, therefore, that the parties were engaged in a bargain, though one into which other than selfish motives entered, and that there was therefore a contract which the plaintiff may enforce.

[4] As to the necessity of bringing in Sandar Kamarony, I am in some doubt. If he be an alien enemy, the case ends, for any rights he had are lost; if he be not, he would be entitled to his day in court on the issue here decided. Strictly, he is entitled to it from any point of view. The difficulty is in giving him any real notice, for his whereabouts is absolutely unknown, except that he was last supposed to be in Hungary. Advertisement in this city would accomplish nothing, except, perhaps, in a Hungarian newspaper. On the whole, I think that the best which can be done is to advertise in some newspaper in Buda-Pest and the next largest city in the present republic. This notice will be printed four times at weekly intervals, and will advise the supposititious claimant that he must file his appearance within six weeks of the last publication. Probably this is a futility, but it is the best possible substitute for actual notice, and in some way the case must be decided.

Decree for the plaintiff.